**EXHIBIT 1 to the Declaration of Paul Bartholomew Green, dated Dec. 16, 2013 submitted in**
*Janet Burton v. iYogi, Inc.*, No. 13-CV-06926 (DAB) (S.D.N.Y.)

JS 44C/SDNY
REV. 7/2012

CIVIL COVER SHEET    13 CV 6926

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of
pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the
Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of
initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| JANET BURTON, individually and on behalf of all others similarly situated | iYOGI, INC., a New York corporation     SEP 3 0 2013 |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
|---|---|
| BERNS WEISS LLP 585 Stewart Avenue, Suite L-20 Garden City, New York 11530 (818) 961-2000 | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Plaintiff brings this action pursuant to 28 U.S.C. § 1332(d)(2) for fraudulent inducement and unjust enrichment.

Has this or a similar case been previously filed in SDNY at any time? No [X] Yes [ ]   Judge Previously Assigned

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ] If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?    No [X]    Yes [ ]

(PLACE AN [x] IN ONE BOX ONLY)                NATURE OF SUIT

TORTS                                                                    ACTIONS UNDER STATUTES

| CONTRACT | | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|---|
| [ ] 110 | INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - | [ ] 610 AGRICULTURE | [ ] 422 APPEAL | [ ] 400 STATE |
| [ ] 120 | MARINE | [ ] 315 AIRPLANE PRODUCT | MED MALPRACTICE | [ ] 620 OTHER FOOD & | 28 USC 158 | REAPPORTIONMENT |
| [ ] 130 | MILLER ACT | LIABILITY | [ ] 365 PERSONAL INJURY | DRUG | [ ] 423 WITHDRAWAL | [ ] 410 ANTITRUST |
| [ ] 140 | NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | PRODUCT LIABILITY | [ ] 625 DRUG RELATED | 28 USC 157 | [ ] 430 BANKS & BANKING |
| | INSTRUMENT | SLANDER | [ ] 368 ASBESTOS PERSONAL | SEIZURE OF | | [ ] 450 COMMERCE |
| [ ] 150 | RECOVERY OF | [ ] 330 FEDERAL | INJURY PRODUCT | PROPERTY | | [ ] 460 DEPORTATION |
| | OVERPAYMENT & | EMPLOYERS' | LIABILITY | 21 USC 881 | PROPERTY RIGHTS | [ ] 470 RACKETEER INFLU- |
| | ENFORCEMENT | LIABILITY | | [ ] 630 LIQUOR LAWS | | ENCED & CORRUPT |
| | OF JUDGMENT | [ ] 340 MARINE | PERSONAL PROPERTY | [ ] 640 RR & TRUCK | [ ] 820 COPYRIGHTS | ORGANIZATION ACT |
| [ ] 151 | MEDICARE ACT | [ ] 345 MARINE PRODUCT | | [ ] 650 AIRLINE REGS | [ ] 830 PATENT | (RICO) |
| [ ] 152 | RECOVERY OF | LIABILITY | [X] 370 OTHER FRAUD | [ ] 660 OCCUPATIONAL | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT |
| | DEFAULTED | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | SAFETY/HEALTH | | [ ] 490 CABLE/SATELLITE TV |
| | STUDENT LOANS | [ ] 355 MOTOR VEHICLE | [ ] 380 OTHER PERSONAL | [ ] 690 OTHER | | [ ] 810 SELECTIVE SERVICE |
| | (EXCL VETERANS) | PRODUCT LIABILITY | PROPERTY DAMAGE | | SOCIAL SECURITY | [ ] 850 SECURITIES/ |
| [ ] 153 | RECOVERY OF | [ ] 360 OTHER PERSONAL | [ ] 385 PROPERTY DAMAGE | LABOR | | COMMODITIES/ |
| | OVERPAYMENT | INJURY | PRODUCT LIABILITY | | [ ] 861 HIA (1395ff) | EXCHANGE |
| | OF VETERAN'S | | | [ ] 710 FAIR LABOR | [ ] 862 BLACK LUNG (923) | [ ] 875 CUSTOMER |
| | BENEFITS | | | STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | CHALLENGE |
| [ ] 160 | STOCKHOLDERS | | | [ ] 720 LABOR/MGMT | [ ] 864 SSID TITLE XVI | 12 USC 3410 |
| | SUITS | | PRISONER PETITIONS | RELATIONS | [ ] 865 RSI (405(g)) | [ ] 890 OTHER STATUTORY |
| [ ] 190 | OTHER | | [ ] 510 MOTIONS TO | [ ] 730 LABOR/MGMT | | ACTIONS |
| | CONTRACT | | VACATE SENTENCE | REPORTING & | | [ ] 891 AGRICULTURAL ACTS |
| [ ] 195 | CONTRACT | | 20 USC 2255 | DISCLOSURE ACT | FEDERAL TAX SUITS | [ ] 892 ECONOMIC |
| | PRODUCT | ACTIONS UNDER STATUTES | [ ] 530 HABEAS CORPUS | [ ] 740 RAILWAY LABOR ACT | | STABILIZATION ACT |
| | LIABILITY | | [ ] 535 DEATH PENALTY | [ ] 790 OTHER LABOR | [ ] 870 TAXES (U.S. Plaintiff or | [ ] 893 ENVIRONMENTAL |
| [ ] 196 FRANCHISE | | CIVIL RIGHTS | [ ] 540 MANDAMUS & OTHER | LITIGATION | Defendant) | MATTERS |
| | | [ ] 441 VOTING | | [ ] 791 EMPL RET INC | [ ] 871 IRS-THIRD PARTY | [ ] 894 ENERGY |
| | | [ ] 442 EMPLOYMENT | | SECURITY ACT | 26 USC 7609 | ALLOCATION ACT |
| REAL PROPERTY | | [ ] 443 HOUSING/ | | | | [ ] 895 FREEDOM OF |
| | | ACCOMMODATIONS | | IMMIGRATION | | INFORMATION ACT |
| [ ] 210 | LAND | [ ] 444 WELFARE | PRISONER CIVIL RIGHTS | | | [ ] 900 APPEAL OF FEE |
| | CONDEMNATION | [ ] 445 AMERICANS WITH | [ ] 550 CIVIL RIGHTS | [ ] 462 NATURALIZATION | | DETERMINATION |
| [ ] 220 | FORECLOSURE | DISABILITIES - | [ ] 555 PRISON CONDITION | APPLICATION | | UNDER EQUAL |
| [ ] 230 | RENT LEASE & | EMPLOYMENT | | [ ] 463 HABEAS CORPUS- | | ACCESS TO JUSTICE |
| | EJECTMENT | [ ] 446 AMERICANS WITH | | ALIEN DETAINEE | | [ ] 950 CONSTITUTIONALITY |
| [ ] 240 | TORTS TO LAND | DISABILITIES -OTHER | | [ ] 465 OTHER IMMIGRATION | | OF STATE STATUTES |
| [ ] 245 | TORT PRODUCT | [ ] 440 OTHER CIVIL RIGHTS | | ACTIONS | | |
| | LIABILITY | (Non-Prisoner) | | | | |
| [ ] 290 | ALL OTHER | | | | | |
| | REAL PROPERTY | | | | | |

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION         DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
UNDER F.R.C.P. 23                        IF SO, STATE:

DEMAND $ 5,000,000    OTHER _____    JUDGE _____    DOCKET NUMBER _____

Check YES only if demanded in complaint
JURY DEMAND: [X] YES [ ] NO          NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

*(PLACE AN x IN ONE BOX ONLY)*                                              **ORIGIN**

[X] 1 Original      [ ] 2 Removed from    [ ] 3 Remanded    [ ] 4 Reinstated or    [ ] 5 Transferred from   [ ] 6 Multidistrict   [ ] 7 Appeal to District
    Proceeding           State Court            from              Reopened            (Specify District)        Litigation             Judge from
                    a. [ ] all parties represented    Appellate                                                                      Magistrate Judge
                                               Court                                                                                  Judgment
                    b. [ ] At least one
                           party is pro se.

*(PLACE AN x IN ONE BOX ONLY)*                          **BASIS OF JURISDICTION**              *IF DIVERSITY, INDICATE*
[ ] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [ ] 3 FEDERAL QUESTION    [X] 4 DIVERSITY        *CITIZENSHIP BELOW.*
                                                    (U.S. NOT A PARTY)                          *(28 USC 1332, 1441)*

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [X] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [X] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Janet Burton
2876 Brier Creek Rd
Mammoth Cave, KY 42259
Edmonson County

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

iYogi, Inc.
181 Hudson Street, Unit 1C
New York, New York 10013
New York County

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:      [ ] WHITE PLAINS    [X] MANHATTAN
              (DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS COMPLAINT.)

DATE          SIGNATURE OF ATTORNEY OF RECORD          ADMITTED TO PRACTICE IN THIS DISTRICT
9/30/13                                                [ ] NO
RECEIPT #                                              [X] YES (DATE ADMITTED Mo. 02  Yr. 1992 )
                                                       Attorney Bar Code # 2441541

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ MAAS _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

JUDGE BATTS

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

6926

------------------------------------------------------------x
                                             :

JANET BURTON, individually and on      :     Case No.:
behalf of all others similarly situated,

                                            :

         *Plaintiff*,             :

                                            :

     *v.*                                        :

iYOGI, INC., a New York corporation,    :

                                           :

         *Defendant*.        :

------------------------------------------------------------x

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Janet Burton ("Plaintiff" or "Burton") by and through her undersigned counsel,

brings this Class Action Complaint and Jury Demand ("Complaint") against Defendant iYogi,

Inc. ("Defendant" or "iYogi") based upon its practice of fraudulently inducing consumers into

purchasing its technical support services. Plaintiff, for her Complaint, alleges as follows upon

personal knowledge as to herself and her own acts and experiences and, as to all other matters,

upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1.     Defendant iYogi is a leading provider of technical support services ("tech

support"). In order to market and sell its services, iYogi offers consumers a free "one-on-one

consultation" with a "tech expert" who can purportedly diagnose the condition of the potential

customer's computer and recommend solutions to fix problems identified.

2.     In reality, and as described in detail herein, iYogi trains its technicians to use a

uniform set of tactics designed to scare potential customers into believing that their computers

are damaged or at-risk, and that the purchase of iYogi's tech support is necessary to remedy those problems. The iYogi technician accomplishes this in two primary ways.

3.      First, during the consultation, the technician uses proprietary iYogi software to remotely take control of the potential customer's computer. Once connected, the iYogi technician interfaces with the computer as if he or she was physically there. Meanwhile, the potential customer watches on-screen as the technician moves the mouse, types, or opens files and folders.

4.      A scripted routine is then performed that is designed to convince the potential customer that the iYogi technician is performing credible, manual diagnostics of the computer. As a part of the routine, the technician identifies "complex" looking files and other items, while claiming that they are hurting the computer's performance. Although these tasks and the accompanying commentary appear technically sophisticated to the average consumer, they are anything but.

5.      Continuing iYogi's scripted routine, the technician downloads proprietary iYogi "diagnostics software" onto the potential customer's computer that purportedly scans the computer to detect and report "errors." By design, this software invariably reports that harmful errors are causing a "Critical" computer status. However, technical analyses demonstrate that, similar to the scripted manual diagnostics performed by the technician, iYogi programmed its software to invariably return alarming results about the computer as another method of frightening the consumer.

6.      The software's fake and alarmist reports, mixed with the deceptive scripted commentary, create a strong cocktail of fraud that convinces the potential customer into believing that their computer is damaged and in need of immediate repair. Equipped with the

frightening (and fake) diagnostic test results, the technician then delivers a convincing sales pitch. In relevant part, the technician warns the potential customer that failure to purchase iYogi's services will result in their computer remaining riddled with harmful errors and other problems uncovered during the consultation, all of which pose additional future harm. Trusting in the technician's assessment, the potential customer pays hundreds of dollars to repair the "critically" degraded computer.

7.      As a result of this business model—using scripted dialogue and the results of fake diagnostic tests during free consultations—thousands (if not millions) of unknowing U.S. consumers have been fraudulently induced into purchasing iYogi's technical support services.

## PARTIES

8.      Plaintiff Janet Burton is a natural person and citizen of the Commonwealth of Kentucky.

9.      Defendant iYogi, Inc. is a corporation incorporated in and existing under the laws of the State of New York, with its headquarters and principal place of business located at 181 Hudson Street, Unit 1C, New York, New York 10013. iYogi conducts business throughout the State of New York, this District, and the United States.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (a) at least one member of the putative Class is a citizen of a state different than Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

11.     This Court has personal jurisdiction over Defendant because its headquarters and principal place of business are located in this District, it conducts business transactions in this

District and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District, the injuries of which Plaintiff complains arose here, and because the decisions resulting in the unlawful conduct alleged in this Complaint originated in and emanated from this District. Venue is additionally proper because Defendant conducts significant business transactions in this District, including soliciting consumer business and entering into consumer and business transactions.

## FACTUAL BACKGROUND

I.     **A Brief Overview of iYogi and its Marketing Practices.**

13.     iYogi is one of the largest providers of consumer technical support services in the world. On its website, iYogi boasts that over 2.5 million customers subscribe to its technical support services, and its financiers include major venture capital firms like SAP Ventures and Sequoia Capital.[1] iYogi heavily promotes its services through online advertisements, via telephone solicitations, and by referral from third-party companies.

14.     According to iYogi, its technical support includes the following services: computer diagnostics and repair, general troubleshooting, updates to computer drivers, security protection against online threats, help connecting to the Internet, and PC speed and performance optimization.[2] Regardless of where a potential customer encounters iYogi's marketing materials,

---

[1]     iYogi Raises $30 Million Led by Sequoia Capital to Accelerate Global Growth in Remote Tech Support Services, http://www.prweb.com/releases/2010/12/prweb4891414.htm (last accessed September 30, 2013).

[2]     Company Profile, http://www.iyogi.com/about-us/company-profile/ (last accessed September 30, 2013).

4

they are encouraged to participate in a free 30-minute consultation call with a "tech expert" to

purportedly diagnose their computer's condition.[3] *See, e.g.,* Figures 1 and 2 below (showing

iYogi's advertisements for its free consultation call).



(**Figure 1.**)



(**Figure 2.**)

15.     Although iYogi's management operates primarily out of its New York

headquarters, the vast majority of its "tech experts" are located at call centers in India.[4] In fact, a

2010 ranking of the fastest growing tech companies in India listed iYogi at number three.[5] It is

these "tech experts" that claim during consultation calls to be technicians trained to diagnose and

fix computer problems.

---

[3]     iYogi website, http://www.iyogi.com (last accessed September 30, 2013).

[4]     Even for day-to-day hassles, just call India!,
http://www.financialexpress.com/news/even-for-daytoday-hassles-just-call-india-/905298/1 (last
accessed September 30, 2013).

[5]     *See* Technology Fast50 India 2010, http://www.deloitte.com/assets/Dcom-
India/Local%20Assets/Documents/Winners_report_Technology_Fast_50_2010.pdf (last
accessed September 30, 2013).

16.     In actuality, iYogi trains its technicians to use deception and high-pressure sales tactics to sell its services. As explained below, iYogi designs and directs technicians to use fake, scripted routines and aggressive sales pitches to fraudulently induce potential customers into believing that their computers are afflicted with errors and that purchase of iYogi's support services—typically at a cost between $99.99 and $179.99 per year—are necessary to remedy such problems.

**II.     iYogi Trains its Technicians to Use Uniform Scare Tactics to Deceive Consumers into Purchasing its Technical Support Services.**

17.     Every iYogi consultation call starts out virtually the same way. The technician who fields the telephone call asks the potential customer several technical-sounding questions about their computer, including inquiries about its manufacturer and operating system. Next, the technican tells the potential customer to open a web browser and navigate to the iYogi-owned and operated website www.1mb.com. Once the website is loaded, the technician instructs the individual to click a button labeled "Download Support Dock." *See* Figure 3 (showing a screenshot of the 1mb.com website and Download Support Dock button).



**(Figure 3.)**

18.    "Support Dock" is proprietary iYogi software that the company claims assists in diagnosing and repairing computer problems, and also allows the consumer to communicate via the Internet with the technician. During the installation process, a screen is displayed indicating that installing Support Dock will "[s]tart a remote session with an iYogi technician . . . ." *See* Figure 4 (showing a screenshot of a Support Dock installation page).



(**Figure 4.**)

19.    After installation, Support Dock launches a separate browser window with text explaining that the technician is going to use iYogi's "Remote tool" software to remotely access the potential customer's computer. *See* Figure 5 (showing a screenshot of the webpage displayed to users prior to the technician taking remote control of the computer).

7

**iYogi**

**THANK YOU** for choosing iYogi Remote Tech Support. Before you continue, please read the following carefully:

☞ This Remote tool will be used by a Certified Technician to assist you with the technical issue, by accessing your computer remotely over the Internet. You will be able to see everything the tech does, and will have full control of your system at all times. It is recommended, however, that you stay in front of the computer, to understand and view the diagnosis and troubleshooting process.

☞ At any time during the session, you can click the Red X button on the remote window, to disconnect the iYogi technician from your computer. All traces of the software will be automatically removed and no one from iYogi can access your computer again, without your permission.

☞ Post session, you will also receive a Customer Satisfaction Survey form to fill. We would appreciate if you can provide us your valuable feedback about the services you received from us.

*Please close all your personal files and folders and click "Continue" to proceed with the Remote Support session, else close this window.*

**CONTINUE →**

(**Figure 5.**)

20.     Once the software is operational and the remote connection is established, the technician is able to perform activities directly on the potential customer's computer as if physically there—*e.g.*, move the mouse cursor, type, open files and directories, or restart the system—and the potential customer watches the technician perform these tasks on-screen and in real time. As explained below, the remote control also provides the technician with ample opportunity to deceive the potential customer.

A.     **After taking control of the potential customer's computer, the iYogi technician invariably "discovers" false problems and threats.**

21.     As part of iYogi's deceptive scheme, the iYogi technician manually performs what appear to be technologically complex "diagnostics" tasks while the potential customer watches on-screen and listens on the phone. During this time, the technician highlights various items on the potential customer's screen and warns that they are harming the computer. However, on information and belief, these actions and commentary are actually scripted and designed by iYogi to cultivate a perception that the technician is technically sophisticated and meaningfully evaluating the computer.

8

22.     By way of example, iYogi technicians will open and browse obscure system folders and tell the potential customer that the files contained therein are harmful to and negatively impacting the computer's performance. In truth, the folders and files viewed by these technicians cannot, by themselves, negatively affect a computer's operations. Specific instances of this include the technician browsing through system-related directories like the Microsoft Windows "prefetch" folder.

23.     The "prefetch" folder contains temporary data files that are automatically generated by the Windows operating system to improve a computer's startup time. Prefetch files usually take non-descript but complex names. While the potential customer is watching, the iYogi technician scrolls through this directory and ominously says over the telephone that files in the prefetch folder are harming the computer. *See* Figure 6 (showing an example of what files in the prefetch directory look like). Although browsing through these files may seem technically complicated, one could not possibly glean any relevant information about the computer's operations by doing so.



(**Figure 6.**)

9

24.     In a similar move, iYogi trains its technicians to run "registry editing" software and browse the Microsoft Windows registry. The registry contains profiles for each user of the computer and information about system hardware, installed programs, and property settings.[6] A registry editor is software that allows the user to inspect the registry.[7]

25.     Like the prefetch folder scenario described above, the iYogi technician scrolls through sections of the registry while claiming that items located there are hurting the computer's performance. *See* Figure 7 (showing an example of what browsing the registry looks like). Similar to the prefetch folder gimmick, arbitrarily looking through the registry cannot yield a credible assessment of a computer's performance.



**(Figure 7.)**

---

[6]      Windows XP Documentation, http://www.microsoft.com/resources/documentation/windows/xp/all/proddocs/en-us/regedit_o.mspx (last accessed September 30, 2013).

[7]      *Id.*

26.     In sum, although it appears to consumers of average technical knowledge that iYogi technicians are legitimately conducting manual diagnostics of their computers during consultation calls, the methods designed and implemented by iYogi *cannot* be used to reliably or honestly deduce the status of a computer's operations. Worse, iYogi technicians deliberately misrepresent the significance of tasks that they are performing to the potential customer, as well as the computer's overall condition.

27.     The intent and effect of these scripted tactics is to fraudulently trick average consumers—who generally lack the requisite technical expertise to understand what the technicians are doing—into believing that iYogi technicians are knowledgeable experts who are truthfully and honestly performing diagnostics testing. To strengthen this impression, the technician also downloads and runs fraudulent iYogi "diagnostics" software.

**B.      The technician downloads and runs proprietary iYogi diagnostic software, which invariably detects and reports problems with the potential customer's computer.**

28.     During every consultation call the iYogi technician directs the potential customer to the iYogi-owned and operated website "www.1mb.com/scan." Immediately after navigating to the website, software called "PCDiagnostics.exe" is automatically downloaded onto the individual's computer. This is iYogi's proprietary "diagnostics software," which purportedly scans and detects harmful errors and threats afflicting an individual's computer, and also reports the overall "System State" of the computer. But just like the technician manually and arbitrarily scrolling through prefetch folders and the Windows registry, the diagnostics software serves as another vehicle to defraud consumers into believing that their computers are damaged.

29.     For illustration, Figure 8 below depicts the results of a scan initiated by an iYogi technician using the diagnostics software on a brand new test computer. Several parts of the

11

software's reporting mechanism merit attention. First, the software reports that the PC's "Score"

is "46%" and that "Attention" is required (noted by a yellow circle). Next, in the bottom right of

the screen, the software reports that the computer's "System State" is "Critical" (noted by a red

circle). Again, iYogi's software provides these results after a scan of *a brand new computer*.



(**Figure 8.**)

30.     Closer examination reveals that the software's algorithm for determining the

existence of harmful items that cause a "Critical" "System State" is wholly arbitrary. For

instance, an analysis of the software's "Junk Content" and "Registry Check" scanning

mechanisms (shown in the green and blue circles in Figure 8, respectively), demonstrate this

point.

31.     In the results, iYogi's diagnostics software reports: "Warning. 187 MB Junk files

detected." This message informs the user (and is often reinforced over the telephone by the

technician) that the computer is afflicted by 187 megabytes of "Junk files." Through forensic

12

inspection, however, it becomes apparent that iYogi's diagnostic software isn't really looking for harmful files—it simply scans and detects files located in the computer's "Recycle Bin" and other directories that store temporary files. As Figure 9 below demonstrates, the total size of these directories equals 187 megabytes, which matches the total size of "Junk Content" reported by iYogi's diagnostics software.



(**Figure 9.**)

32.  Contrary to iYogi's software's warning, the simple existence of these "junk files," without any analysis of the underlying files, does not merit a "warning"—nor is it credible to claim that they contribute to a "Critical" system status.

33.  The truth is that iYogi designed its software to report that "junk files" are adversely affecting potential customers' computers—without any actual assessment of the files or their impact—to frighten users into believing that their computers are damaged or at-risk. Because these files will be present on nearly every computer, this technique virtually ensures that every potential customer will receive a warning that "junk files" are harming their computer.

34.     The diagnostics software also reports that a number of registry "errors" are negatively affecting the computer. For example, in testing, the diagnostics software's scan report returned the following: "Caution. 18 Registry errors detected." *See* Figure 10 below.



(**Figure 10.**)

35.     But what iYogi refers to as "registry errors" are actually registry keys. Registry keys are essentially computer files that store settings and configuration information for a given computer application—such as a user's default font size in Microsoft Word. Through normal computer usage, registry keys may no longer be necessary for their designated purposes (such as if the user uninstalls Microsoft Word in the previous example), and may be removed by the user or left alone without consequence. Yet iYogi's diagnostics software detects these registry keys, characterizes them as "errors" deserving of "caution," and claims they are contributing to a "Critical" system state. None of that is technically accurate. The mere presence of registry keys (used or unused)—without more—is completely normal and cannot cause any appreciable impact to a computer's performance.

36.     Nonetheless, the technician, while viewing the results of the diagnostics software's scan along with the potential customer, claims that the "junk files" and "registry errors," among other detected items, cause crashes, create errors messages, or force the computer to restart. These warnings are supported by the "Critical" status and "PC Score" displayed through the software's false report.

14

37.     The reason that iYogi designed its software to rely on "junk files" and "Registry errors" in diagnosing a potential customer's computer is plain. Mainly, the files that fit the definition of "junk files" under iYogi's software's rubric are naturally occurring (and recurring) innocuous files on computers running Microsoft Windows. The same goes for the registry keys that make up "Registry errors." By using this sort of algorithm, iYogi has virtually guaranteed that *every* potential customer will receive warnings from the software that "junk files" and "Registry errors" are hurting the computer. The iYogi technician can then point to these damning results as reason to purchase iYogi's technical support services.

**C.      Exploiting the false results of the manual assessment and the report generated by iYogi's diagnostics software, the technician informs the potential customer that purchase of technical support services is necessary to "fix" their computer.**

38.     At the end of the consultation—after the technician has alerted the potential customer of their computer's "Critical" state and existence of harmful files—the technician makes the sales pitch. First, the technician aggressively attempts to persuade the potential customer that he or she should purchase iYogi's technical support services (costing on average, $179 per year) to "fix" the problems reported by the software and "uncovered" by the technician's fake evaluation tasks. Next, the technician vigorously up-sells the potential customer on additional multi-year contracts that cost an extra two to three hundred dollars per year.

39.     Unfortunately, as explained herein, the reality is that iYogi designed its scripted technician dialogue and fraudulent diagnostics software to invariably report that potential customers' computers are in dire condition. In reliance on such representations, thousands, if not millions of U.S. consumers have been deceived into purchasing iYogi's technical support services.

### III.   Industry Analysts and iYogi's Own Business Partners Criticize its Sales Tactics.

40.   Recently, controversy has begun to swirl around iYogi's deceptive sales tactics. For instance, after conducting their own investigations into iYogi's practices, a number of independent computer and security experts have publicly announced that iYogi's business practices are dishonest[8] and have even compared iYogi's sales tactics to how the "Mob markets protection: through fear and intimidation."[9]

41.   Even certain of iYogi's business partners—who referred their own customers to iYogi for technical support—are have admonished it for the deceptive sales tactics at issue here.[10] For instance, on March 15, 2012, antivirus software developer and iYogi business partner AVAST Software publicly announced that it was terminating its relationship with iYogi because it found iYogi's sales behavior "unacceptable."

42.   The common theme amongst these reports—a theme reinforced by Plaintiff's experience in this case—is that iYogi designed its sales tactics and software to misrepresent the condition of potential customers' computers to lure them into believing that they need to purchase subscriptions to iYogi's technical support services. Despite these reports, iYogi continues to use the same deceptive tactics.

---

[8]      *See* Aghast at Avast's iYogi Support, http://krebsonsecurity.com/2012/03/aghast-at-avasts-iyogi-support/ (last accessed September 30, 2013); *see also* Steer Clear of iYogi's Scareware Tactics, http://www.itworld.com/it-managementstrategy/260532/steer-clear-iyogis-scareware-tactics (last accessed September 30, 2013).

[9]      *See* Tech support or extortion? You be the judge, http://www.infoworld.com/t/cringely/tech-support-or-extortion-you-be-the-judge-189168 (last accessed September 30, 2013).

[10]     *See* iYogi Support Service Removed, https://blog.avast.com/2012/03/15/iyogi-support-service-removed/ (last accessed September 30, 2013).

**IV.**    **Plaintiff Burton's Experience.**

43.    On or around September 16, 2012, Plaintiff Burton sought tech support for her poorly performing HP computer. Specifically, Burton's computer was running slowly, freezing and locking-up. As a result, Burton searched the Internet for "HP tech support."

44.    The first result displayed in Burton's Internet search was a sponsored advertisement for iYogi—which was intentionally designed to look like an official looking "HP" advertisement—substantially similar to those depicted in Figures 11-13 below.

Ads ⓘ

**HP Tech Support**
www.iyogi.net/HP-Tech/HP-Tech-Support ▾
1 (877) 559 2813
Call iYogi Techs Now (US Toll-Free)
24x7 Instant **Tech Support** for HP PC

(**Figure 11.**)

**Online Tech Support** for HP
**supportforhp.iyogi**.com/**hp-support**-online.html ▾
At 1-855-461-6161 **iYogi** provides wide scope **HP support** online for users to resolve all
**HP** computer related issues through the assistance of **iYogi** Certified Technicians.

(**Figure 12.**)

**HP Support**, Online **Support** for HP, Troubleshoot Issues - **iYogi**
www.**iyogi**.com/**hp-support**.html ▾
Avail **support** for HP by **iYogi** Certified Technicians. The experts can help troubleshoot
several **HP** errros like overheating issues, registry conflicts, etc. Just call 1 ...

(**Figure 13.**)

45.    After clicking on the sponsored advertisement, Burton was directed to a website, that unbeknownst to her, was actually owned and operated by iYogi. *See* Figure 14 (showing a screenshot of iYogi's HP tech support landing page).



(**Figure 14.**)

46.     After navigating to its website, iYogi strongly encouraged Burton to call its toll-free telephone number to purportedly obtain support services for her malfunctioning computer.

47.     In reliance on these statements, and seeking to find a solution to fix her computer, Burton decided to call the toll-free telephone number displayed on iYogi's website.

48.     After being connected with a "tech support expert" via telephone, Burton explained her computer troubles and asked whether the technician could help fix her computer. Plaintiff recalls that the iYogi technician responded "yes" and then asked her to navigate to the website www.1mb.com and download its remote connection software, as described in Section II above.

49.     After establishing the remote connection, the iYogi technician proceeded to browse through Plaintiff Burton's computer, highlighting various files while stating that they were contributing to the computer's problems. For example, Burton recalls that the iYogi technician navigated to the computer's registry and indicated that several entries were causing the computer's performance issues.

50.     The iYogi technician then informed Burton that she needed to download iYogi's "diagnostic software" so that the technician could perform a "diagnostic scan" and purportedly

18

identify problems afflicting the computer. Burton downloaded the "diagnostic software" in reliance upon the representations made by the technician about its functionality, which were substantially similar to those contained in Paragraph 28 above, and reasonably believed that iYogi's diagnostic software would truthfully scan her computer and report harmful errors.

51.     The iYogi technician then performed a diagnostic scan using the software. After the scan was complete, Burton recalls that the software displayed a graphical depiction of a "Dashboard," as shown in Figure 8 above, indicating that her computer possessed a large amount of "junk files" and "Registry errors." The software also reported—in ominous red typeface—that her computer's "System State" was "Critical."

52.     While the "Dashboard" and its warnings were still visible on Burton's screen, the iYogi technician informed Burton that her computer was at serious risk, damaged, and in need of repair. More alarmingly, the iYogi technician informed Burton that her computer would likely crash if she didn't purchase its services and repair her computer.

53.     Contrary to the representations above—made by the technician and through iYogi's diagnostic software itself—no credible assessment of Burton's computer was actually conducted.

54.     Ultimately, the truth is that the issues identified above were false or exaggerated and not actually causing damage to Burton's computer as indicated by the technician and the software as described herein. As such, Burton was misled into believing that her computer was at-risk and that she needed to purchase iYogi's tech support services. Relying on iYogi's representations, Burton agreed to purchase a one-year "iYogi Gold Subscription" for $99.99.

55.     But for iYogi's representations made by the technician and through the "diagnostic software" about the condition of her computer, Burton would not have purchased

19

iYogi's technical support services.

56.    To make matters worse, even after subscribing to iYogi's technical support

services, Burton's computer continued to experience the same problems she experienced before

iYogi technicians claimed to have "fixed" the supposed issues affecting her computer.

## CLASS ALLEGATIONS

57.    **Class Definition**: Plaintiff Burton brings this action pursuant to Fed. R. Civ. P.

23(b)(2) and (3) on behalf of herself and a Class of similarly situated individuals, defined as

follows:

> All individuals and entities in the United States that purchased iYogi's technical
> support services after a "free consultation."

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents,

successors, predecessors, and any entity in which the Defendant or its parents have a controlling

interest and its current and former employees, officers, and directors, (2) the Judge or

Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's

immediate family, (3) persons who execute and file a timely request for exclusion, (4) persons

whose claims in this matter have been finally adjudicated on the merits or otherwise released,

and (5) the legal representatives, successors, or assigns of any such excluded person.

58.    **Numerosity**: The exact number of Class members is unknown to Plaintiff at this

time, but on information and belief, iYogi has sold its services to thousands (if not millions) of

consumers throughout the country, making joinder of each individual member impracticable.

Ultimately, Class members will be easily identified through iYogi's records.

59.    **Commonality and Predominance**: Common questions of law and fact exist as to

all members of the Class and predominate over any questions affecting only individual members:

(a)    whether Defendant intentionally designed its free "consultations" to

deceive consumers into believing their computers suffer from harmful errors without regard for the actual status of those computers;

(b)     whether Defendant intentionally designed its proprietary "diagnostic scan" software to invariably report that harmful errors and threats exist on a consumer's computer, regardless of its actual condition;

(c)     whether Defendant's conduct described herein constitutes fraudulent inducement; and

(d)     whether Defendant has unjustly received money belonging to Plaintiff and members of the Class, and whether, under principles of equity and good conscience, Defendant should not be permitted to retain it.

60.     **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of iYogi's uniform wrongful conduct during transactions with Plaintiff and the Class.

61.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and iYogi has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the resources to do so. Neither Plaintiff nor her counsel have any interests adverse to those of the other members of the Class.

62.     **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because iYogi has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards

of conduct toward the members of the Class, and making final injunctive relief appropriate with

respect to the Class as a whole. iYogi's policies challenged herein apply and affect members of

the Class uniformly and Plaintiff's challenge of these policies hinges on iYogi's conduct with

respect to the Class as a whole, not on facts or law applicable only to Plaintiff. iYogi has acted

and failed to act on grounds generally applicable to Plaintiff and the other members of the Class,

requiring the Court's imposition of uniform relief to ensure compatible standards of conduct

toward members of the Class.

63.   **Superiority**: This class action is appropriate for certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of

this controversy and joinder of all members of the Class is impracticable. The damages suffered

by the individual members of the Class will likely be small relative to the burden and expense of

individual prosecution of the complex litigation necessitated by iYogi's wrongful conduct. Thus,

it would be virtually impossible for the individual members of the Class to obtain effective relief

from iYogi's misconduct. Even if members of the Class could sustain such individual litigation,

it would not be preferable to a class action because individual litigation would increase the delay

and expense to all parties due to the complex legal and factual controversies presented in this

Complaint. By contrast, a class action presents far fewer management difficulties and provides

the benefits of single adjudication, economies of scale, and comprehensive supervision by a

single court. Economies of time, effort, and expense will be fostered and uniformity of decisions

will be ensured.

64.   Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

Definition" based on facts learned in discovery.

## FIRST CAUSE OF ACTION
### Fraudulent Inducement
### (On Behalf of Plaintiff and the Class)

65.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

66.     As depicted with particularity in Sections II.A and II.B above, and as described throughout all Counts of this Complaint, iYogi intentionally designed its free consultation process to falsely represent to potential customers: (1) the efficacy and accuracy of iYogi technicians' "manual diagnostics" tasks; (2) the reports generated by iYogi's software, including the software's false representations about "Junk Content" and "Registry Check" errors, as well as a computer's overall "System State"; and (3) the need to purchase iYogi services to "repair" the problems identified through the foregoing.

67.     By and through these methods, iYogi fraudulently induced Plaintiff and the members of the Class into purchasing iYogi services. In particular, iYogi falsely represented that Plaintiff's and the Class's computers were harmed or at risk based on the technicians' false manual diagnostics tasks, as well as by highlighting the software's fake report, which claimed that their computers were in "Critical" condition.

68.     iYogi's representations were in fact false. In particular, iYogi's software does not conduct any credible analysis of a computer's condition and cannot actually render meaningful reports regarding a computer's condition, as described in Section II.B above. Moreover, the "errors" identified by iYogi do not actually negatively impact the condition of a computer. In addition, as explained in Section II.A, iYogi technicians' manual diagnostics tasks cannot actually be relied upon to assess the condition of a computer.

69.     The representations made by iYogi about Plaintiff's and the Class's computers were material terms of Plaintiff's and the Class's transactions with iYogi because they directly

affected Plaintiff's and the Class's choice of, or conduct regarding, whether to purchase iYogi's

services. Any deception or fraud related to the utility of a product or service is materially

misleading.

70.     iYogi knew that its representations about Plaintiff's and the Class's computers

were false, as it developed the "consultation call" scripts and its diagnostics software. iYogi

intentionally trained its representatives to mislead consumers into purchasing its services with

fake manual diagnostics tasks, and by using software that it intentionally designed to falsely

report computer errors and that computers are in a "Critical" state.

71.     iYogi intentionally made the aforementioned misrepresentations for the purpose

of inducing Plaintiff and the Class into purchasing subscriptions to iYogi's technical support

services. Plaintiff and the Class did in fact rely upon these misrepresentations and purchased

subscriptions to iYogi's technical support services.

72.     Lacking the requisite technical expertise to independently understand iYogi's

diagnostics, and taking iYogi's technicians' statements (and the diagnostics software's reports) at

face value, Plaintiff and the Class justifiably relied upon iYogi's misrepresentations, and would

not have purchased iYogi's services but for the misrepresentations that they needed to purchase

iYogi's services to repair their computers.

73.     As a result, Plaintiff and the Class have been damaged in the amount of iYogi's

technical support subscription purchase price, or at least a portion thereof.

74.     In light of the foregoing, Plaintiff seeks an order: (1) requiring Defendant to pay

actual and compensatory damages; and (ii) requiring Defendant to pay interest, reasonable

attorneys' fees and costs. Plaintiff further requests that if the Court finds that Defendant's

conduct and misrepresentations were made with malice and in conscious disregard for Plaintiff's

and the Class's rights, they should be awarded punitive damages against Defendant in an amount

to deter such conduct in the future.

### SECOND CAUSE OF ACTION
#### Unjust Enrichment
#### (On Behalf of Plaintiff and the Class)

75.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

76.     Defendant has knowingly received and retained benefits from Plaintiff and the

Class through its fraudulent scheme that would render it unjust to allow it to retain such benefits.

Specifically, Defendant has received and retained Plaintiff's and the Class's money in the form

of the purchase price for subscriptions to iYogi's technical support services, which Plaintiff and

the Class members paid under false pretenses because of the fake assessment provided by iYogi

technicians and its diagnostic software.

77.     Defendant appreciates and has knowledge of such benefits.

78.     Under principles of equity and good conscience, Defendant should not be

permitted to retain the monies belonging to Plaintiff and the Class that it unjustly received as a

result of its wrongful conduct described herein.

79.     Accordingly, Plaintiff, individually and on behalf of the Class, seeks restitution

and disgorgement of all monies unjustly received and retained by Defendant.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Janet Burton, on behalf of herself and the Class, respectfully

requests that this Court enter an order:

A.     Certifying this case as a class action on behalf of the Class defined above,

appointing Plaintiff as class representative, and appointing her counsel as class counsel;

B.     Declaring that iYogi's actions, as set out above, constitute fraudulent inducement;

C.      Awarding damages, including punitive damages where applicable, to Plaintiff and the Class in an amount to be determined at trial;

D.      Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia,* an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

E.      Awarding restitution to Plaintiff and the Class in an amount to be determined at trial, and requiring Defendant to disgorge all amounts by which it has been unjustly enriched;

F.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

H.      Entering such other injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

I.      Awarding such other and further relief as the Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**JANET BURTON**, individually and on behalf of all others similarly situated,

Dated: September 30, 2013                 By: _____

One of Plaintiff's Attorneys

LEE A. WEISS
(lweiss@bernsweiss.com)
BERNS WEISS LLP
585 Stewart Avenue, Suite L-20
Garden City, New York 11530
Telephone: (516) 501-9640
Facsimile: (818) 999-1500

RAFEY S. BALABANIAN*
(rbalabanian@edelson.com)
BENJAMIN H. RICHMAN*
(brichman@edelson.com)
CHANDLER R. GIVENS*
(cgivens@edelson.com)
DAVID I. MINDELL*
(dmindell@edelson.com)
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Pro Hac Vice admission to be sought

27