**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
JANET BURTON, individually and on          :      Case No.: 1:13-cv-06926-DAB
behalf of all others similarly situated,          :
:
*Plaintiff*,          :
:
*v.*          :
:
iYOGI, INC., a New York corporation,          :
:
*Defendant*.          :
:
-----------------------------------------------------------------x

**PLAINTIFF JANET BURTON'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ......................................... 3

      A.    iYogi's Technicians Use Scripted Scare Tactics to Deceive Consumers
            into Believing Their Computers are at Risk and Purchasing its Support
            Services ................................................................................................. 3

      B.    Burton Relied on iYogi's Scare Tactics When She Purchased its Technical
            Support Services ................................................................................... 4

      C.    Plaintiff's Investigation Reveals that iYogi's Technicians Invariably
            "Discover" Problems on Consumers' Computers ................................ 6

      D.    Industry Analysts and iYogi's Business Partners Criticize its Sales Tactics ...... 6

III.  ARGUMENT ...................................................................................................... 7

      A.    The Court May Not Properly Consider the Documents Attached to iYogi's
            Motion to Dismiss ................................................................................ 7

      B.    Burton Sufficiently Pleads Her Claim for Fraudulent Inducement ................... 8

            i.    Burton Satisfies Rule 9(b)'s Heightened Pleading Requirements ............... 9

            ii.   iYogi's Alleged Misrepresentations are not Mere Puffery ...................... 10

            iii.  iYogi's Reliance on the *Bilodeau, Worley,* and *Gross* cases is
                  Misplaced ................................................................................... 12

      C.    Burton States a Claim for Unjust Enrichment ................................. 14

      D.    Burton Timely Filed Her Claims ...................................................... 15

IV.   CONCLUSION ................................................................................................ 17

## TABLE OF AUTHORITIES

**United States Circuit Court of Appeals Cases**:

*Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566 (2d Cir. 2005)....................... 9

*Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15 (2d Cir. 1983) .......................................... 15

*Faulkner v. Beer*, 463 F.3d 130 (2d Cir. 2006) ............................................... 7, 8

*Harris v. City of N.Y.,* 186 F.3d 243 (2d Cir. 1999) ........................................ 16

*Henry v. Daytop Village, Inc.*, 42 F.3d 89 (2d Cir. 1994)................................... 14

*Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000)............................................ 15

*Lipton v. Nature Co.*, 71 F.3d 464 (2d Cir. 1995) ........................................ 11

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148 (2d Cir. 2003) .......... 16

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007).................................7, 15 n.6

**United States District Court Cases**:

*2004 Stuart Moldaw Trust v. XE L.I.F.E., LLC*, 642 F. Supp. 2d 226 (S.D.N.Y. 2009)................. 15

*Arnold v. Goetz*, 245 F. Supp. 2d 527 (S.D.N.Y. 2003)............................................ 8 n.2

*Barberan v. Nationpoint*, 706 F. Supp. 2d 408 (S.D.N.Y. 2010).................................... 7, 8

*Basquiat ex rel. Est. of Basquiat v. Sakura Intern.*,
    No. 04-cv-1369, 2005 WL 1639413 (S.D.N.Y. 2005) ....................................... 12

*Bilodeau v. McAfee, Inc.*,
    No. 12-cv-04589, 2013 WL 3200658 (N.D. Cal. June 24, 2013)............................... 12, 13

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d 162 (S.D.N.Y. 2011) ..................................................... 9

*Fargas v. Cincinnati Mach., LLC*,
    No. 13-cv-4443, 2013 WL 6508863 (S.D.N.Y. 2013) .................................... 16, 17

*Fink v. Time Warner Cable*, 810 F. Supp. 2d 633 (S.D.N.Y. 2011)................................ 11

*FTA Mkt. Inc. v. Vevi, Inc.*, No. 11-cv-4789, 2012 WL 383945 (S.D.N.Y. Feb. 1, 2012)............... 16

*Gross v. Symantec Corp.*,
    No. 12-cv-00154, 2012 WL 3116158 (N.D. Cal. July 31, 2012).............. 11 n.3, 12, 13 n.4

*Hall v. Tune Up Corp.*, No. 13-cv-1804, 2013 WL 4012642 (N.D. Ill. Aug. 6, 2013) .......... 11 n.3

*Hopkinson v. Estate of Siegal*,
    No. 10-cv-1743, 2011 WL 1458633 (S.D.N.Y. Apr. 11, 2011) ........................................ 16

*In re Scotts EZ Seed Litig.*, No. 12-cv-4727, 2013 WL 2303727 (S.D.N.Y. 2013) .................. 11, 12

*Jernow v. Wendy's Intern., Inc.*, No. 07-cv-3971, 2007 WL 4116241 (S.D.N.Y. 2007)................ 12

*Kregler v. City of New York*, 770 F. Supp. 2d 602 (S.D.N.Y. 2011) ........................................ 8 n.2

*Landon v. County of Orange*, No. 08-cv-8048, 2009 WL 2191335 (S.D.N.Y. July 23, 2009) ........ 8

*Larson v. Eney*, No. 08-cv-3513, 2009 WL 321256 (S.D.N.Y. 2009) ............................................ 15

*Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512 (S.D.N.Y. 2003) ........................................ 11

*Pollak v. Bank of Am.*, No. 12-cv-7726, 2013 WL 4799264 (S.D.N.Y. 2013) ............................. 16

*Ruso v. Morrison*, 695 F. Supp. 2d 33 (S.D.N.Y. 2010) .................................................... 16

*Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009) .............................................. 11 n.3

*Sommer v. PMEC Associates and Co. Ltd.*,
    No. 88-cv-2537, 1992 WL 196748 (S.D.N.Y. Aug. 5, 1992) ........................................ 12

*State Farm Mut. Auto Ins. Co. v. Accurate Medical, P.C.*,
    No. 07-cv-0051, 2007 WL 2908205 (E.D.N.Y. Oct. 4, 2007) ...................................... 17 n.8

*State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94 (E.D.N.Y. 2010) ................... 16, 17

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510 (S.D.N.Y. 2009) ........................ 11

*Sulton v. Greiner*, No. 00-cv-727, 2000 WL 1809284 (S.D.N.Y. Dec.11, 2000).................... 8 n.2

*Worley v. Avanquest N. Am., Inc.*,
    No. 12-cv-04391, 2013 WL 450388 (N.D. Cal. Feb. 5, 2013)............................................ 12

**State Court Cases**:

*Nigro v. Lee,* 63 A.D.3d 1490 (N.Y. App. Ct. 2009) ................................................................11-12

**<u>Miscellaneous Authorities</u>**:

Fed. R. Civ. P. 8 ............................................................................................................ 14, 15

Fed. R. Civ. P. 12 ............................................................................................................ 8 n.2

N.Y. C.P.L.R. § 213 ............................................................................................................ 16

## I.        INTRODUCTION

This case challenges Defendant iYogi, Inc.'s ("iYogi") deceptive marketing and sale of its remote computer support services to consumers nationwide. iYogi's sales and marketing strategy is simple: Consumers searching the Internet for computer support services encounter iYogi's online advertisements, which promise that iYogi can diagnose and repair various common computer problems and encourage them to contact iYogi's telephone technicians for a consultation. Then, each time a consumer speaks with an iYogi technician, they are confronted with the same scripted assessment of their computer and invariably told that their machine is damaged or at-risk—regardless of its actual condition—and that the purchase of iYogi's support services is necessary to repair it. From there, the consumer is required to pay iYogi for its services (typically $179 or more), which ultimately cannot provide the promised computer repairs and protection.

Plaintiff Janet Burton ("Burton") is just one of thousands of consumers across the country that iYogi duped into paying for its tech support services. Having gotten no help with her computer problems nor a refund from iYogi, Burton brought the instant action on behalf of herself and a nationwide class of similarly situated consumers, seeking to recover the fees they paid iYogi for its services and to ensure that its deceptive practices do not continue in the future. iYogi now seeks dismissal of Burton's Class Action Complaint ("Complaint") in its entirety on the basis of several, ultimately unavailing, arguments.

First, iYogi argues that Burton's fraud claims fail because (i) they do not meet the heightened pleading requirements of Rule 9(b), (ii) Burton fails to allege that iYogi made any misrepresentations of material fact or had any fraudulent intent, and (iii) iYogi's alleged misstatements amount to mere puffery. Additionally, iYogi argues that a valid sales contract—attached to its motion to dismiss in the form of its supposed "Terms of Use" ("TOU")—exists

between the parties and limits the statutory period applicable in this case such that Burton's claims are untimely. Finally, iYogi argues that the existence of the TOU also precludes Burton from asserting her claim for unjust enrichment. None of iYogi's arguments withstand scrutiny.

First, Burton easily satisfies Rule 9(b) by alleging *when* she viewed and relied upon iYogi's misrepresentations (September 2012), *where* she viewed and relied upon them (online, during her consultation call, and through the report of iYogi's diagnostics software); and *who* made them (iYogi and its telephone technicians). The Complaint also makes clear that iYogi knew its representations were false inasmuch as it trained its technicians to *always* discover "problems and threats" on customers' computers—*regardless of their condition*—and thus, also knew that it was incapable of repairing those conjured errors. Further, iYogi's representations were not mere puffery, but rather, objective statements—*e.g.*, about iYogi's ability to repair common computer errors—whose falsity can easily be determined. In any event, because iYogi knew its statements were false, they are actionable even if they would otherwise be considered puffery.

Next, iYogi may not rely upon its purported "Terms of Use" as a basis for dismissal. Indeed, because Burton does not plead, reference or otherwise rely upon, and disputes the authenticity of, the TOU, that document may not properly be considered on iYogi's Rule 12(b)(6) motion to dismiss—nor can the testimony of iYogi's President of Marketing who purports to authenticate the TOU. But, even if that was not the case (it is), it is still clear from the face of the Complaint that Burton brought her claims within both the TOU's limited one-year statutory period and the two- to six-year statutory period typically applied to fraud claims under New York law.

Similarly, the existence of the TOU alone would not render Burton's unjust enrichment claim inappropriate, because (as in any case) she may plead otherwise inconsistent theories of liability in the alternative to one another. And, Burton's unjust enrichment claim is even more

appropriate here given that iYogi's TOU are not properly before the Court at this point.

For all of these reasons and as discussed more fully below, iYogi's motion to dismiss should be denied in its entirety.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   iYogi's Technicians Use Scripted Scare Tactics to Deceive Consumers into Believing Their Computers are at Risk and Purchasing its Support Services.

iYogi is one of the largest providers of consumer technical support services in the world. (*See* Class Action Complaint and Jury Demand, Dkt. 1 ["Compl."] ¶ 13.) According to iYogi, consumers can use its services for computer diagnostics and repair, general troubleshooting, updates to computer drivers, security protection against online threats, help connecting to the Internet, and PC speed and performance optimization. (*Id*. ¶ 14.) In order to market and sell its services, iYogi offers consumers a free "one-on-one consultation" call with a "tech expert" who can purportedly diagnose the condition of the potential customer's computer and recommend solutions to fix the problems identified. (*Id*. ¶¶ 1, 14.)

However, iYogi trains its technicians to use a uniform set of sales tactics to scare potential customers into believing that their computers are damaged or at-risk, and that the purchase of iYogi's tech support is necessary to remedy those problems, regardless of the actual condition of their computers. That is, during every consultation call, the technician will invariably "detect" and report problems with the potential customer's computer. (*Id*. ¶ 28.) The technician then represents—both through the scripted, manual assessment of the computer and the report generated by iYogi's diagnostics software (described further below)—that the detected problems can be "fixed" if the potential customer purchases iYogi's technical support services (costing, on average, $179 per year). (*Id*. ¶ 38.)

The iYogi technician accomplishes this in two ways. First, during the consultation, he or

she uses proprietary iYogi software to remotely take control of the potential customer's computer. (*Id.* ¶¶ 3, 18-20.) Once connected, a scripted routine is performed—by interfacing with the computer as if the technician was physically there (*i.e.*, moving the mouse, typing, and opening files and folders)—which is designed to convince the potential customer that the technician is performing credible, manual diagnostics on the computer. (*Id.* ¶ 4.) Then, the technician downloads "diagnostics software" onto the computer, which purportedly scans the machine to detect "errors." (*Id.* ¶ 5.) By design, the software invariably reports that harmful errors are causing a "Critical" computer status. (*Id.*)

Equipped with the software's fake and alarmist reports, together with the scripted commentary, the iYogi technician then convinces the potential customer that his or her computer is damaged and in need of immediate repair, and that the purchase of iYogi's technical support services is required to make those repairs. (*Id.* ¶ 6.)

### B. Burton Relied on iYogi's Scare Tactics When She Purchased its Technical Support Services.

Plaintiff Burton is one such consumer who fell victim to iYogi's deceptive sales and marketing tactics. On or around September 16, 2012, Burton sought tech support for her poorly performing HP computer. (*Id.* ¶ 43.) After searching the Internet for "HP tech support", the first result displayed in Burton's web browser was a sponsored advertisement for iYogi, which was designed to look like an official "HP" advertisement. (*Id.* ¶ 44.) After clicking on the sponsored advertisement, Burton was directed to a website that—unbeknownst to her—was actually owned and operated by iYogi. (*Id.* ¶ 45.)

After navigating to its website, iYogi strongly encouraged Burton to call its toll-free telephone number to speak with a technician. (*Id.* ¶ 46.) Once connected with a "tech support expert" via telephone, Burton explained her computer troubles and asked whether the technician

could help fix her computer. (*Id.* ¶ 48.) Burton recalls that the technician responded "yes" and then instructed her to navigate to the website www.1mb.com and download iYogi's remote connection software. (*Id.*) After establishing the remote connection, the iYogi technician proceeded to browse through Burton's computer, highlighting various files while stating that they were contributing to her computer's problems. (*Id.* ¶ 49.) For instance, Burton recalls that the technician navigated to the computer's registry and indicated that several entries were causing performance issues. (*Id.*)

The technician then informed Burton that she needed to download iYogi's "diagnostic software" so that he could perform a "diagnostic scan" and purportedly identify the exact problems afflicting the computer. (*Id.* ¶ 50.) Relying on the technician's representations regarding its functionality (*see id.* ¶ 28), Burton downloaded the "diagnostic software" and reasonably believed that it would truthfully scan her computer and report the existence of any harmful errors. (*Id.* ¶ 50.) After the scan was complete, Burton recalls that the software displayed a graphical depiction of a "Dashboard," (*see id.*, Figure 8), indicating that her computer possessed a large number of "junk files" and "Registry errors." (*Id.* ¶ 51.) The software also reported—in ominous red typeface—that her computer's "System State" was "Critical." (*Id.*)

While the "Dashboard" and its warnings were still visible on Burton's screen, the iYogi technician informed Burton that her computer was at serious risk, damaged, and in need of repair. (*Id.* ¶ 52.) More alarmingly, the iYogi technician informed Burton that her computer would likely crash if she did not purchase its services and repair it. (*Id.*) Relying on iYogi's representations, Burton agreed to purchase a one-year "iYogi Gold Subscription" for $99.99. (*Id.* ¶ 54.) But, even after subscribing to iYogi's tech support services, Burton's computer continued to experience the same problems she encountered before iYogi claimed to have "fixed" them. (*Id.* ¶ 56.)

### C.      Plaintiff's Investigation Reveals that iYogi's Technicians Invariably "Discover" Problems on Consumers' Computers.

The results of Burton's (and her counsel's) investigation confirmed her suspicions: iYogi's technicians invariably discover problems and threats on a consumer's computer, regardless of the computer's actual condition. (*See id.* ¶¶ 17-39.) By way of example, iYogi technicians will manually open and browse obscure system folders—as the technician did during Burton's call—and tell the potential customer that the files contained therein are harmful to and negatively impacting the computer's performance. (*Id.* ¶ 22.) In truth, the folders and files viewed by the technicians cannot, by themselves, negatively affect a computer's operations. (*Id.*)

Second, during every consultation call the iYogi technician performs a "scan" of the potential customer's computer using iYogi's proprietary software called "PCDiagnostics.exe", which purportedly scans and detects harmful errors and threats afflicting a computer and also reports the overall "System State" of the computer. (*Id.* ¶ 28.) Burton's counsel's investigation, however, confirmed that this software is designed to report that certain files—present on nearly every computer—are adversely affecting potential customers' computers without performing any actual assessment of their impact on a particular machine. (*Id* ¶¶ 33-35.) For example, when a scan detects "registry errors," it's actually detecting registry keys, which are essentially computer files that store settings and configuration information for a given computer application. (*Id.* ¶ 35.) Setting aside that iYogi's software characterizes these "registry keys" as "errors" deserving of "caution," and that they are contributing to a "Critical" system state, the mere presence of registry keys (used or unused)—without more—is completely normal and cannot cause any appreciable impact on a computer's performance. (*Id.*)

### D.      Industry Analysts and iYogi's Business Partners Criticize its Sales Tactics.

Recently, controversy has begun to swirl around iYogi's deceptive sales tactics. (*Id.* ¶ 40.)

For instance, after conducting their own investigations into iYogi's practices, a number of independent computer and security experts have publicly announced that iYogi's business practices are dishonest and even compared them to how the "Mob markets protection: through fear and intimidation." (*Id*.) Even certain of iYogi's business partners—who previously referred their own customers to iYogi for technical support—have admonished the company for the deceptive sales tactics at issue here. (*Id*. ¶ 41.)

In particular, on March 15, 2012, antivirus software developer and iYogi business partner AVAST Software announced that it was terminating its relationship with iYogi because it found iYogi's sales behaviors "unacceptable." (*Id*.) The common theme amongst these reports is that iYogi designed its marketing, sales tactics and software to misrepresent the condition of potential customers' computers and lure them into purchasing subscriptions to its support services, which ultimately cannot offer the promised benefits. (*Id*. ¶ 42.)

## III.   ARGUMENT

### A.   The Court May Not Properly Consider the Documents Attached to iYogi's Motion to Dismiss.

As an initial matter, iYogi's reliance on the materials attached to its motion to dismiss—its TOU and the declaration of its President of Marketing, Vishal Dhar, which purports to authenticate the TOU (the "Dhar Declaration")—is misplaced. On a Rule 12(b) motion, the Court may only consider the documents that are "asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). Moreover, "before materials outside the record may become the basis for a dismissal, several conditions must be met." *Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 415 (S.D.N.Y. 2010) (*citing Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). Namely, "it must be clear on the record that no dispute

exists regarding the authenticity or accuracy of the document . . . and that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134 (internal citations omitted); *see also Landon v. County of Orange*, No. 08-cv-8048, 2009 WL 2191335, at *5 n.5 (S.D.N.Y. July 23, 2009) ("[T]he court may consider a document that is 'integral' to the complaint, partially quoted in the complaint, or relied upon by the plaintiff in drafting the complaint *if* there is no dispute regarding the document's authenticity or accuracy, and there is no issue of fact as to its relevance.") (emphasis added).

iYogi's TOU and the Dahr Declaration fail this test. That is, they are not referenced in, attached to, nor otherwise relied upon in Burton's Complaint. Instead, her claims exist independently of—and in no way arise under—the proffered materials. Additionally, because the documents directly contradict Burton's allegations on their face, their authenticity and applicability are squarely in dispute.[1] *See Barberan,* 706 F. Supp. 2d at 415-16 (refusing to consider "documents notwithstanding Plaintiffs' reference to or selective reliance on them in their Amended Complaint because *Faulkner* makes clear that even documents 'integral' to a complaint cannot be considered if the record shows a dispute regarding authenticity.") (*citing Faulkner*, 463 F.3d at 134). Thus, the Court may not properly consider the documents at this time.[2]

### B.     Burton Sufficiently Pleads Her Claim for Fraudulent Inducement.

Turning to its substantive arguments, iYogi first seeks dismissal of Burton's fraudulent

---

[1]     For example, Burton has had no opportunity to test the veracity of Mr. Dahr's testimony nor any of iYogi's records relied upon in the Declaration. In any event, as discussed further in Sections III.C-D, *infra*, these documents do not lend support to iYogi's arguments.

[2]     Consideration of these materials would also improperly convert the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *see also Kregler v. City of New York*, 770 F. Supp. 2d 602, 607 (S.D.N.Y. 2011); *Arnold v. Goetz*, 245 F. Supp. 2d 527, 540 (S.D.N.Y. 2003) (*quoting Sulton v. Greiner*, No. 00-cv-727, 2000 WL 1809284, at *1 (S.D.N.Y. Dec.11, 2000)).

inducement claim, arguing she failed (i) to satisfy Rule 9(b)'s heightened pleading requirements, (ii) allege that iYogi made misrepresentations of material fact or had any fraudulent intent, and (iii) that its alleged misrepresentations constitute mere puffery. Each of iYogi's arguments falls flat.

i.     Burton Satisfies Rule 9(b)'s Heightened Pleading Requirements.

In order to adequately state a claim for fraud, Rule 9(b) "requires that the plaintiff 'allege the time, place, speaker and sometimes even the content of the alleged misrepresentation.'" *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 579 (2d Cir. 2005). Ultimately, the purpose of Rule 9(b) is to give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 199 (S.D.N.Y. 2011). Here, Burton's allegations easily meet (and exceed) this standard.

First, Burton specifically alleges the "time, place, speaker and content" of her fraud claims. She specifies *when* she searched for computer tech support, viewed iYogi's online advertisements and marketing materials, called an iYogi "tech support expert", and relied on that technician's scripted representations—in September 2012. (*Id*. ¶¶ 43-56.) She also details *where* iYogi's misrepresentations were made—in online advertisements (*see id.*, Figures 11-14) and on iYogi's websites (*e.g.*, its HP tech support and www.1mb.com webpages) (*see id.* ¶¶ 45, 48, Figure 14), as well as during the "consultation call" (via the technician's scripted manual assessment of her computer and the "diagnostic software's" scan results). (*Id*. ¶¶ 49, 51-52.) And, she identifies *who* made the misrepresentations—iYogi and its technician. (*Id*. ¶¶ 49, 51-52, Figures 11-14.) In addition, Burton provides the specific content of the representations: that her computer possessed a large amount of "junk files" and "Registry errors," that these items were causing her computer's

9

"System State" to be "Critical", and that the purchase of iYogi's tech support services was necessary to repair those problems and protect her computer going forward. (*Id.* ¶ 51.)

The Complaint further makes clear that iYogi knew its representations were false. By way of example, Burton alleges that iYogi both intentionally (i) trained its technicians to *always* discover "problems and threats" on a potential customer's computer, and (ii) designed its diagnostics software to invariably report that certain files (which are present on virtually every computer) are adversely affecting potential customers' computers—all without ever conducting any actual assessment of the files or their impact. (*Id.* ¶¶ 21-27, 29, 30 33, Figure 8.)

Burton also explains *why* iYogi's representations were false. For instance, the mere presence of registry keys (or in iYogi's terms, "Registry errors") and/or "junk files" does not merit a "warning", nor is it credible to claim that they contribute to a "Critical" system status. (*Id.* ¶¶ 30-37.) Rather, iYogi describes these innocuous files—present on nearly every computer—in such harsh terms to ensure that virtually every potential customer will receive a warning that their computer is at risk and that the purchase of its services is necessary to fix them. (*Id.* ¶¶ 33-37.)

With these details, iYogi cannot credibly claim that it is not sufficiently on notice of the claims it is called upon to meet here. Accordingly, Burton's Complaint meets Rule 9(b)'s heightened pleading requirements and iYogi's motion should be denied.

        ii.      <u>iYogi's Alleged Misrepresentations are not Mere Puffery.</u>

Next, and despite iYogi's arguments to the contrary, its alleged misrepresentations are also a far cry from puffery. Under New York law, a statement constitutes puffery when it is a generalized, exaggerated or subjective statement that cannot be proven either true or false. *See Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 526 (S.D.N.Y. 2009) (*citing Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)); *see also Fink v. Time Warner Cable*, 810

F. Supp. 2d 633 (S.D.N.Y. 2011); *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512 (S.D.N.Y. 2003). By contrast, it is well established that (as in this case) representations regarding the ability of certain products or services to perform in a measurable way are not puffery. *See*, *e.g.*, *In re Scotts EZ Seed Litig.*, No. 12-cv-4727, 2013 WL 2303727 (S.D.N.Y. 2013).

First, with respect to Burton's and the class's computers, iYogi's alleged misrepresentations were not just its subjective opinions about the statuses of the machines, but rather, objective descriptions of their conditions (*e.g.*, that they contained a large amount of "junk files" and/or "Registry errors", and had "Critical" "System State[s]"). Similarly, iYogi's misrepresentations about its own capabilities (*e.g.*, that its diagnostics software could accurately detect and report various computer errors and threats, and that its technicians were capable of remedying such issues) were objective descriptions of the services iYogi offered to perform. These are simply not the sorts of vague and general statements that have typically been considered mere puffery.[3] *See*, *e.g.*, *Fink*, 810 F. Supp. 2d at 644 ("terms like 'blazing fast' and 'fastest, easiest' are classic examples of generalized puffery."); *Nigro v. Lee,* 63 A.D.3d 1490, 1492 (N.Y. App. Ct. 2009) (advertisement describing car as "gorgeous" was "generalized expression [of] the seller's opinion of the car and constitutes no more than 'puffery'. . . .") (internal quotation marks omitted); *but see Jernow v. Wendy's Intern., Inc.*, No. 07-cv-3971, 2007 WL 4116241, at *2 (S.D.N.Y.

---

[3]     Courts considering similar arguments about nearly identical marketing statements and in-software representations—including an opinion relied upon by iYogi here—have agreed with Burton's position here. *See*, *e.g.*, *Hall v. Tune Up Corp.*, No. 13-cv-1804, 2013 WL 4012642 (N.D. Ill. Aug. 6, 2013) (holding alleged misrepresentations were not puffery where plaintiff alleged that software developer fraudulently represented both the purpose and ability of its software, and where the free trial version of the software fraudulently identified harmful errors on plaintiff's computer to induce her to purchase the full version of the software); *Gross v. Symantec Corp.*, No. 12-cv-00154, 2012 WL 3116158, at *10 (N.D. Cal. July 31, 2012) (holding that software developer's representations regarding the functional capabilities of its so-called utility software were not mere opinions "or a 'vague superlative' that a 'consumer could not reasonably believe.'") (*citing Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 987 (N.D. Cal. 2009)).

2007) (finding that specific misrepresentations about the content of trans fat were sufficient to state a claim); *In re Scotts EZ Seed Litig.*, 2013 WL 2303727, at *7 (finding that statements where manufacturer promised that product would perform in specific, measurable ways were sufficient to state a claim).

In any event, even if iYogi's statements could be considered puffery (they cannot), they are still actionable because Burton alleges that iYogi made the statements with full knowledge of their falsity. *See Sommer v. PMEC Associates and Co. Ltd.*, No. 88-cv-2537, 1992 WL 196748, at *5 (S.D.N.Y. Aug. 5, 1992) ("Even if two of the three statements would normally be considered to be puffing . . . and therefore not actionable under New York law . . . defendants here have alleged that plaintiffs made all of the representations with knowledge that they were false.") (internal citation omitted); *see also Basquiat ex rel. Est. of Basquiat v. Sakura Intern.*, No. 04-cv-1369, 2005 WL 1639413 (S.D.N.Y. 2005); *see also* Section III.B.i, *supra*.

Accordingly, iYogi's arguments should be rejected in this regard as well.

       iii.    <u>iYogi's Reliance on the *Bilodeau*, *Worley*, and *Gross* cases is Misplaced.</u>

Finally, iYogi's reliance on the dismissals *without prejudice* in the *Bilodeau v. McAfee, Inc.*, No. 12-cv-04589, 2013 WL 3200658 (N.D. Cal. June 24, 2013); *Worley v. Avanquest N. Am., Inc.*, No. 12-cv-04391, 2013 WL 450388 (N.D. Cal. Feb. 5, 2013); and *Gross v. Symantec Corp.*, 2012 WL 3116158, cases is misplaced. While the claims in this case and *Bilodeau*, *Worley*, and *Gross* are similar in that they stem from the deceptive design and marketing of products supposedly capable of repairing personal computers, the similarities end there. Indeed, whereas the focus of the claims in *Bilodeau*, *Worley*, and *Gross* was on the alleged deceptive design and marketing of the defendants' utility software products, in this case, iYogi is alleged to have uniformly trained its technicians to deliver deceptively scripted sales pitches as the primary means

to accomplish its fraudulent goals.

The specificity of the pleadings in each case is also demonstrably different. For example, whereas in *Bilodeau* the court found that the plaintiff's allegations regarding the alleged misrepresentations and the software's failure to function as advertised were lacking and fell short of Rule 9(b)'s heightened pleading requirements, *see* 2013 WL 3200658, at *7-11, here, Burton pleads far more—including more than 50 allegations spanning nearly 20 pages, supplemented by 14 screenshots (including screenshots of iYogi's actual advertisements—which Burton relied upon—and of its diagnostic software's scan results) as well as numerous direct quotes from iYogi itself.[4] The detail in Burton's Complaint is aimed at specifically (i) identifying iYogi's business model (*i.e.*, using scripted dialogue and fake diagnostics tests during free consultation calls to scare potential customers into purchasing its tech support services) (Compl. ¶¶ 1-7, 38-42), (ii) identifying the manner in which iYogi's technicians conduct manual assessments of potential customers' computers (*id*. ¶¶ 1-7, 14-27), (iii) describing the metrics used by iYogi's diagnostics software, what files the software scans, what within those files the software analyzes, and how the results are characterized and reported (*id*. ¶¶ 28-37), and (iv) why those processes are ultimately unreliable and deceptive. (*Id*. ¶¶ 1-37.)

Also unlike the plaintiffs in *Bilodeau*, *Worley*, and *Gross*, Burton goes to great lengths to describe her own experience with iYogi. In doing so, she pleads in detail why she was searching for tech support (*id*. ¶¶ 43-44), which of iYogi's websites she visited and which representations she viewed and relied upon (*id*. ¶¶ 44-47), how iYogi's technician manually assessed the condition of

---

[4]     iYogi's reliance on the *Gross* matter is particularly misplaced in this regard. In that case, the court found the plaintiff's allegations lacking because he had paraphrased the defendants' alleged misrepresentations. *Gross*, 2012 WL 3116158, at *4-5. As a result, the court ordered the plaintiff to allege what the defendants "actually said"—for example, by direct quotations from their advertisements and websites, as Burton has done here. *Id.* at *3, 5.

her computer and then performed a diagnostics scan using its software (*id.* ¶¶ 49-51), how the software scanned her computer (*id.* ¶¶ 51-52), and why she purchased iYogi's Gold Subscription tech support plan as a result. (*Id.* ¶¶ 54-55.)

Accordingly, iYogi's argument that the dismissal orders in the *Bilodeau*, *Worley* and *Gross* cases support a finding that Burton has failed to meet federal pleading requirements should also be rejected.[5]

## C.    Burton States a Claim for Unjust Enrichment.

iYogi next contends that Burton's unjust enrichment claim should be dismissed because a valid and enforceable contract—the supposed TOU—exists between the parties, thus rendering her unjust enrichment theory inconsistent and inappropriate. (Def. Mot. at 15-16.) This argument also fails.

Indeed, even if a valid contract existed between the parties, at the pleadings stage, "a plaintiff may plead two or more statements of a claim . . . regardless of consistency." *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 95 (2d Cir. 1994); *see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Such alternative—albeit inconsistent—theories are allowed where the exact nature of the facts is in doubt or the legal nature of the plaintiff's right and defendant's liability depend on facts not well known to the plaintiff. *See 2004 Stuart Moldaw Trust v. XE L.I.F.E., LLC*, 642 F. Supp. 2d 226, 240 (S.D.N.Y. 2009) *aff'd*, 374 Fed. Appx. 78 (2d Cir. 2010) (unpublished); *see also* Fed. R. Civ. P. 8(d)(3). For this reason alone, Burton's unjust enrichment claim should survive. *See Larson v. Eney*, No. 08-cv-

---

[5]    iYogi also fails to mention that the *Worley* court ultimately denied the defendant's motion to dismiss the second amended complaint in that case, which is now well into class and merits discovery; that the *Gross* matter has since been resolved by the parties on a class-wide basis; and, that the *Bilodeau* case is slated to be re-filed against the actual developer of the software in question, as opposed to the reseller originally named.

3513, 2009 WL 321256, at *2 (S.D.N.Y. 2009) ("Defendant also moves to dismiss plaintiff's breach of implied contract and unjust enrichment claims on the ground that the two claims are inconsistent…. The motion is denied. Pleading in the alternative is expressly permitted under the Federal Rules.").

Notwithstanding, to state a claim for unjust enrichment, a plaintiff must allege "(1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)). Here, Burton alleges that iYogi voluntarily accepted a benefit from her in the form of the $99 fee she paid to purchase its support services and that iYogi retained that benefit inasmuch as she has yet to receive a refund of the monies she paid. (Compl. ¶¶ 76, 79.) And, finally, Burton alleges that it would be unjust for iYogi to retain those monies because it failed to provide the computer repair and protection services it promised. (*Id.* ¶ 78.)

With these allegations, Burton has sufficiently pleaded her claim for unjust enrichment, and this claim should survive.[6]

### D.    Burton Timely Filed Her Claims.

Finally, iYogi contends that Burton's claims are time-barred because its TOU required her to file this action "within one (1) year after the cause of action arose". (Def. Mot. at 16.) This argument fails as well.

Foremost, and as explained above, the Court cannot consider iYogi's TOU, nor its contractual limitations period at this stage of the litigation. Instead, the "Court may only dismiss

---

[6]       Again, iYogi's conclusory statement that a "valid and enforceable" contract exists is inapposite. As explained above, Burton does not allege that she agreed to iYogi's TOU nor does she refer to them in her Complaint. Thus, they may not be relied upon to defeat her unjust enrichment claim here. *See McCarthy*, 482 F.3d at 191.

[this] action based on the statute of limitations if, on the face of the complaint, it is clear that the claim is untimely." *FTA Mkt. Inc. v. Vevi, Inc.*, No. 11-cv-4789, 2012 WL 383945, at *3 (S.D.N.Y. Feb. 1, 2012) (*citing Harris v. City of N.Y.,* 186 F.3d 243, 250 (2d Cir. 1999)); *see also Fargas v. Cincinnati Mach., LLC*, No. 13-cv-4443, 2013 WL 6508863, at *7 (S.D.N.Y. 2013) ("[A] pre-answer motion to dismiss on this ground [*i.e.*, expiration of the statute of limitations] may be granted only if it is clear on the face of the complaint that the statute of limitations has run . . . .").

Under New York law, the statute of limitations for fraud-based claims like those at issue here is the "greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); *see also Pollak v. Bank of Am.*, No. 12-cv-7726, 2013 WL 4799264 (S.D.N.Y. 2013). More specifically, the limitations period begins "to run [only] after the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" *Hopkinson v. Estate of Siegal*, No. 10-cv-1743, 2011 WL 1458633, at *5 (S.D.N.Y. Apr. 11, 2011) (*quoting LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003)); *Ruso v. Morrison*, 695 F. Supp. 2d 33, 45-46 (S.D.N.Y. 2010); *State Farm Mut. Auto. Ins. Co. v. Rabiner*, 749 F. Supp. 2d 94, 103-04 (E.D.N.Y. 2010).

In this case and even assuming (as iYogi suggests) that the statutory period began to run from the date Burton purchased her iYogi subscription—September 16, 2012—it's clear on the face of the Complaint that by filing this case on September 30, 2013, she asserted her claims well within New York's statutory period for fraud. *See Fargas*, 2013 WL 6508863, at *7. In reality though, because the statutory period did not begin to run until Burton discovered that she was fraudulently induced into purchasing iYogi's services—which occurred later, when she realized

16

that her computer was continuing to malfunction (Compl. ¶ 56)—her claims were also timely asserted under the more limited statutory period iYogi claims applies.[7] *See Rabiner*, 749 F. Supp. 2d at 103-04 ("In light of Plaintiff's allegations, it is plausible that Plaintiff could not discover defendants' fraudulent acts until sometime after the actual injury occurred.").

Accordingly, Burton's claims are not time-barred.[8]

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff Janet Burton, individually and on behalf of all others similarly situated, respectfully requests that the Court enter an Order (i) denying Defendant iYogi, Inc.'s motion to dismiss in its entirety, (ii) requiring iYogi to answer Plaintiff's Class Action Complaint and Jury Demand, and (iii) providing such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

**JANET BURTON**, individually and on behalf of all others similarly situated,

Dated: January 16, 2014                    By:  /s/ Benjamin H. Richman
                                                 One of Plaintiff's Attorneys

---

[7]    That is, because Burton did not reasonably discover the fraudulent nature of iYogi's representations until several weeks after her September 16, 2012 purchase (when her computer continued to malfunction)—nor could she given the information asymmetry between the parties and her lack of technical expertise to assess the true nature of iYogi's practices—and filed this case on September 30, 2013, she was well within the one-year period contemplated by iYogi's purported TOU. (*See* Def. Mot. at 15-16.)

[8]    Nevertheless, if there is any question about the timing of Burton's discovery of the fraud at issue, the Court should refrain from making this "fact-sensitive" determination now and instead allow discovery to proceed on the issue. *See State Farm Mut. Auto Ins. Co. v. Accurate Medical, P.C.*, No. 07-cv-0051, 2007 WL 2908205, at *2 (E.D.N.Y. Oct. 4, 2007) ("[D]efendants' argument that plaintiff's claims . . . are barred by the statute of limitations necessarily assumes facts that are beyond the pleadings and that have yet to be developed").

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin H. Richman (Admitted *Pro Hac Vice*)
brichman@edelson.com
Chandler R. Givens (Admitted *Pro Hac Vice*)
cgivens@edelson.com
David I. Mindell (Admitted *Pro Hac Vice*)
dmindell@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Lee A. Weiss
lweiss@bernsweiss.com
BERNS WEISS LLP
585 Stewart Avenue, Suite L-20
Garden City, New York 11530
Tel: 516.501.9640
Fax: 818.999.1500

## CERTIFICATE OF SERVICE

I, Benjamin H. Richman, an attorney, hereby certify that on January 16, 2014, I served the above and foregoing ***Plaintiff Janet Burton's Opposition to Defendant's Motion to Dismiss Complaint***, by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this 16th day of January 2014.

/s/ Benjamin H. Richman